THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-HC-2078-D

UNITED STATES OF AMERICA      )
                              )
          Petitioner,         )
                              )    **PETITIONER'S PROPOSED FINDINGS OF**
          v.                  )    **FACT AND CONCLUSIONS OF LAW**
                              )
ATIBA WADE,                   )
                              )
          Respondent.         )

## INTRODUCTION

Petitioner, the United States, seeks to civilly commit Respondent, Atiba Wade, as a "sexually dangerous person" under Section 302(4) of the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), Pub. L. No. 109-248, Title 111, § 302(4), 120 Stat. 587, 620-22 (2006), codified at 18 U.S.C. §§ 4247-4248. Petitioner must prove by clear and convincing evidence that Respondent is sexually dangerous. A person is sexually dangerous if he "has engaged or attempted to engage in sexually violent conduct or child molestation and . . . is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). To determine that a person is sexually dangerous to others, a court must find that he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(6). Petitioner proposes the following findings or fact and conclusions of law:

## FINDINGS OF FACT

### A. Procedural History

**1.** On April 20, 2007, Petitioner certified Respondent pursuant to 18 U.S.C. § 4248. (See D.E. #1.) On September 11, 2007, Respondent filed a motion to dismiss the certification relying on this Court's holding in United States v. Comstock, 5:06-HC-02195-BR, entered on September 7, 2007. (See D.E. #8.) On January 8, 2008, the Court stayed the proceedings pending resolution of the appellate process in Comstock. (See D.E. #16.)

**2.** On June 11, 2010, the stay was lifted. (See D.E. #20.) On January 27, 2011, Respondent requested a commitment hearing for the first time. (See D.E. #31.) On September 12, 2011, this Court set the hearing for January 19, 2012. (See D.E. #68.)

**3.** The parties filed a Proposed Joint Pre-Trial Order on December 22, 2011. (See D.E. #78.) Petitioner has identified eighteen exhibits for admission, and three witnesses it may call during its case-in-chief: 1) Dr. Tanya Cunic, 2) Dr. Gary Zinik, and 3) Respondent. Respondent has identified two exhibits for admission, and three witnesses he may call during his case-in-chief: 1) Dr. Joseph Plaud, 2) Respondent, and 3) JoAnn Wade. The Court entered the Amended Joint Pre-Trial Order on January 13, 2012. (See D.E. #82.)

**B.  Personal and Family Data**[1]

**1.**  Respondent was born in 1971 in Cleveland, Ohio.  His parents were never married.  He was raised by his mother and grandmother.  His father was absent during his childhood, and he is estranged from his father.  He has half siblings on his father's side, but he does not have a close relationship with them.

**2.**  Respondent claims that he has a good relationship with his mother and that they correspond frequently.  She currently lives in Henderson, Nevada.  He plans on living with her if he gets released.  Respondent lived with his mother at her current residence when he was out of federal prison for a few months in 2006 before he violated the terms of his supervised release and was returned to custody.

**3.**  Respondent stated that his childhood was not difficult and that he graduated from high school in Cleveland.  He stated that he had positive experiences in high school.

**4.**  After Respondent graduated from high school in 1990, he enlisted in the Army.  Respondent was an enlisted man in the Military Intelligence branch of the Army from 1990 until 1993.  He was stationed in New Jersey, Arizona, Hawaii, and Korea.  After he got out of the Army in Hawaii in 1993, Respondent remained in Hawaii until

---

[1]The information in Sections B-D is taken primarily from the Petitioner's Exhibits and the transcript of Respondent's deposition taken on November 2, 2011.

about 1999.   Respondent was in Hawaii state prison or a halfway house for most of 1993-1999.   In 1999, Respondent returned to Cleveland. In May 2002, Respondent was arrested and spent the next few years incarcerated.   In January 2006, Respondent was released from prison and moved to Nevada with his mother.   A few months later, in August 2006, Respondent was returned to federal prison for violating the terms of his supervised release.   Respondent has remained in federal custody since August 2006.

**5.**   Respondent has never married and has no children. Respondent claims to be bisexual with about 80% of his sexual interests directed to males and 20% of his sexual interests directed to females.   He is currently in a relationship with another Adam Walsh respondent at FCI Butner.

**6.**   Respondent stated that he does not and has never abused alcohol or illegal drugs.

**7.**   Respondent denied that he was sexually abused as a child.

**8.**   Respondent has had jobs in the past when not incarcerated, most recently as a taxi dispatcher in Las Vegas in 2006.   Respondent was convicted of a federal crime related to his sales job in 2002.

**9.**   If Respondent is released, he has no term of supervision remaining.

**C.   Respondent's Criminal History**

1. In April 1989, when Respondent was 18 years old, he allegedly performed oral sex on a three year old little boy and had the three year old boy perform oral sex on him in Cleveland. In October 1989, Respondent was arrested, charged with one count of rape, and spent a few days in jail. A few months later, the charge was "dismissed for want of prosecution." In his deposition, Respondent refused to answer questions about this arrest. However, he never denied engaging in sexual contact with a three year old boy in 1989.

2. In January 1993, while stationed in the Army in Hawaii, Respondent was charged under the UCMJ with one count of Indecent Acts or Liberties with a Child, and one count of Production or Publication of Pornographic Photographs. Respondent dropped off a roll of film for developing at a store where it was discovered that the film contained exposures of a pre-pubescent boy touching his exposed penis. During the investigation witnesses reported that Respondent spent a great deal of time with children who were between four and eleven years old at a local bowling alley giving them money for video games in the arcade. One mother observed children reaching into Respondent's pants pockets to get money, and she told Respondent that this act was inappropriate. She then asked Respondent why he liked playing with children to which he replied that "he was a child." Respondent was also seen at an elementary school even though he did

not have children and had no good reason to be at the school. Investigators interviewed the boy from the photos. The boy believed Respondent was seventeen years old (Respondent was actually twenty-one years old). Respondent admitted that he took the photos. During the investigation, Respondent was found in possession of several photos of other children. In one picture of three sleeping prepubescent boys, one of the boy's genitals were exposed and Respondent's hand was touching the boy's genitals. Respondent admitted that he pulled the prepubescent boy's pants down and took the picture while he touched the boy's genitals. The military charges were transferred to civilian authorities, and the Army discharged Respondent for his misconduct in July 1993.

**3.** In March 1993, a woman saw Respondent sitting with her three year old son on a porch across the street. She approached Respondent and observed that he suddenly moved his hand away from her son's lap. She took her son and inspected his genitalia. She observed that her son's penis was red. The three year old boy verbally confirmed that Respondent had touched his genitals, and Respondent was arrested. He was convicted of sexual assault in Hawaii state court on February 1, 1994, and sentenced to 90 days incarceration and five years of probation.

**4.** On November 7, 1994, a few months after he was released from his 90 day sentence and released on probation. Respondent's

probation was revoked because he failed to refrain from frequenting areas where minors congregate. Basically, Respondent was hanging out in an arcade with little kids again, just as he had done when he was in the Army. He also engaged in sexual contact with an eleven year old boy. Respondent enticed an eleven year old boy into a public restroom bathroom stall with him where he exposed his genitals to the boy, had the boy touch his penis, and also touched the boy's penis. Respondent also exposed his genitals to several other minor males. Respondent was sentenced to five years in prison for this probation revocation

5.   In February 2002, Respondent was indicted in federal court in Ohio on one count of Conspiracy to Commit Wire and Mail Fraud, two counts of Wire Fraud, and two counts of Mail Fraud. He pleaded guilty to the first count, and the other counts were dismissed. He was sentenced to thirty months incarceration. Respondent was paroled on January 6, 2006 with a 3 year term of supervised release.

6.   On May 7, 2002, Respondent was arrested in Cuyahoga County, Ohio and charged with (1) Disseminating Matter Harmful to Juveniles, (2) Pandering Obscenity, and (3) Possession of Criminal Tools. While in the public restroom of a public library, Respondent showed a nine year old boy playing cards that had pictures of naked people on them. Respondent wanted to entice the boy to participate in sexual acts with him in the bathroom, similar to his crime in 1994.

Respondent pleaded guilty to all three charges, and on September 2, 2002, he was sentenced to 18 months of custody. At least part of this sentence was served in conjunction with or immediately prior to his federal criminal sentence from the fraud charges.

7. Respondent was released on January 6, 2006, and began his three years of community supervision in Nevada. He attended sex offender treatment per the terms of his supervised release. On August 24, 2006, he was arrested for violating the following two conditions of his supervised release: 1) committing another federal, state, or local crime: On Saturday, July 22, 2006, while in a public restroom at a movie theater, he enticed a young boy to watch him masturbate. He was sitting in a bathroom stall when he observed a young boy enter the stall next to his. Respondent became sexually aroused by the child's presence, dropped a one dollar bill on the floor to gain the child's attention, and then masturbated. This crime is disturbingly similar to two of his prior crimes in 1994 and 2002; 2) associating with persons under the age of eighteen, except in the presence of a responsible adult who is aware of the nature of your background and current offense, and who has been approved by the probation officer: during the month of July 2006, Respondent frequently visited the community pool near his mother's residence where he lived at times when children were swimming. He spoke with the children, pushed and pulled them around the pool on rafts, and

admitted to physically grabbing at least one boy by the arm to pull him around the pool. Respondent told the probation officer that the incident in the movie theater bathroom was the culmination of his pent up sexual frustration. During the morning hours of July 22, 2006, Respondent met a male adult in the shower at the Anthem Community Center and performed fellatio on him. The other man did not reciprocate with any sexual act for Respondent which left Respondent in a state of sexual arousal. The sex offender therapist who was treating Respondent at this time thought that Respondent's behavior was extremely high risk and that Respondent was a threat to minors in the community. On September 21, 2006, Respondent was returned to custody for 8 months for violation of "Association with Persons Under 18."

**D.  Respondent's Mental and Emotional Health**

**1.**    Respondent admitted that he is a pedophile and will always be a pedophile. Respondent admitted that he is sexually attracted to boys aged nine to twelve years old, but also that he has engaged in sexual activity with boys as young as three years old in the past. He claimed that the sexual acts with three year old boys were more just a target of opportunity than a true sexual preference. Respondent admitted that it was wrong of him to engage in sexual activity with boys and that boys lack the capacity to willingly participate in sexual activity with adults. He admitted that, even

9

though it was wrong, he did it anyway because he wanted to. He admitted that he had sexual fantasies about reliving the sex crimes he committed.

2. Respondent participated in sex offender treatment in Hawaii for a few months in 1993-1994 before his parole was revoked for "his deviant, offending cycles (i.e., continuing to frequent places where minors congregate, continuing to review pornographic materials, exposing himself to minors, and touching young males)." He self reported many of these deviant acts to his sex offender therapist in 1994.

3. Respondent also participated in sex offender treatment in Las Vegas, Nevada, while on supervised release in 2006. His sex offender therapist classified him as "extremely high risk" and described him as "a threat to minors in the community."

4. Respondent has not participated in the Sex Offender Treatment Program at FCI Butner neither during his incarceration nor since his certification under 18 U.S.C. § 4248. Respondent admitted that he needs sex offender treatment to help him control his pedophilia, but he has refused to participate in it for the past five years.

E. **Evaluation of Respondent by Dr. Gary Zinik**

1. Dr. Gary Zinik is a clinical and forensic psychologist who has a great deal of experience appearing as an expert witness in

various courts to provide his opinions related to his forensic evaluations. His Curriculum Vitae is Government Exhibit 1. His March 25, 2011, forensic evaluation detailing his evaluation of Respondent for civil commitment as a sexually dangerous person is Government Exhibit 2.

2.     Dr. Zinik opined that Respondent meets the criteria as a sexually dangerous person as described in 18 U.S.C. § 4247(a)(5),(6).

3.     In forming his opinion, Dr. Zinik reviewed the written discovery provided to Respondent, some of which is presented to the Court as Government Exhibits 7-18. The written discovery includes information related to Respondent's criminal history, social history, institutional reports, investigative records related to his sexual conduct and psychological evaluations by other mental health care providers. He also considered Respondent's range of risk using actuarial tools and dynamic risk and need assessment.

4.     Dr. Zinik determined that Respondent had previously committed or attempted to engage in child molestation, specifically six separate incidents described above in 1989, twice in 1993, 1994, 2002, and 2006.

5.     Dr. Zinik diagnosed Respondent with the following mental disorder: pedophilia, sexually attracted to males, exclusive type and a deferred diagnosis of some features of a personality disorder.

6.     Dr. Zinik noted that Respondent was sexually dangerous for

some of the following reasons: He commits new sexual offenses while under community supervision for prior sexual offenses, suggesting a sexual compulsion and a lack of volitional control over his pedophilia. He not only eroticizes children, but he also identifies with them emotionally. He tried to spend large amounts of time hanging out with children and playing with them. One young boy described Respondent as his "best friend" noting their shared interests (hanging out at the bowling alley arcade and playing video games). Once when asked why he spends so much time with children Respondent replied, "he was a child." Feeling emotionally identified with children and preferring their company to adults (also called "emotional congruence with children") is a dynamic risk factor that increases sexual reoffending. (See Government Ex. 2, 8.)

7. Dr. Zinik used the SRA-FV Light to assess Respondent's dynamic risk factors. Respondent received a score of 2.99 on that tool. Anything higher than 2.9 is considered a very high level of needs to manage a sex offender's risk to the community. (See id. 9-11.)

8. Dr. Zinik also used three actuarial tools to consider Respondent's static risk factors as compared to other similarly situated sex offenders who are released from custody: the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), the Static99-R, and the Static2002-R. The MnSOST-R is an actuarial measure shown to be

a moderately accurate predictor of sexual recidivism (defined as likelihood of rearrest for a contact sexual offense within the first six years of release from incarceration). Respondent's score on the MnSOST-R was a 10 and his comparison group was "high" which means that the estimated recidivism rate for Respondent in six years is 30%. The Static99-R and Static2002-R are similar to the MnSOST-R in theory, but rely on slightly different static factors and have different comparison groups. Respondent's score on the Static99-R was an 8 and his comparison group was "high" which means that the estimated recidivism rate for Respondent in five years is 45% after release from incarceration and in ten years is 55.3%. Respondent's score on the Static2002-R was a 9 and his comparison group was "high" which means that the estimated recidivism rate for Respondent in five years is 41.6% after release from incarceration and in ten years is 52.3%. (See id. 11-13.)

**9.** Dr. Zinik also considered whether Respondent has shown any type of characteristics that might mitigate his risk today. Dr. Zinik determined that Respondent is not likely to have a reduced life span, nor does he suffer from any obvious physical issues that would preclude his ability to reoffend because he is a fairly healthy forty year old man. Also, Dr. Zinik found that there was not much evidence of Respondent taking steps to reduce his risk such as living in the community for a long period of time without a sexual offense against

children or completing sex offender treatment. The only potentially positive indication that Respondent was taking steps to mitigate his risk is a lack of any disciplinary problems while incarcerated. However, Dr. Zinik did not find this very compelling because Respondent is not currently in a situation where he could easily manifest his prior pedophilic acts. (See id. 14-15.)

**10.** Dr. Zinik summarized his final opinion about Respondent as follows:

> [Respondent] scored in the very high needs/risk range on the SRA-FV which assesses dynamic/psychological risk factors and long term vulnerabilities that predispose him towards future sexual offending. On the actuarial scales, [Respondent] scored in the high risk range for sexual reoffense on the Static-99R, the Static-2002R, and the MnSOST-R. Each of these instruments predicts whether an offender will be charged with a new sexual offense. However, many sexual offenses go undetected, unreported, and/or uncharged. Consequently all of these scales underestimate the probability that an offender will *commit* a new undetected/uncharged sexual offense during the remainder of his lifetime. In addition, the longest follow-up period on the actuarial scales is 10 years, so longer follow-up times would have a slightly higher risk estimate.
>
> [Respondent]'s career as a sex offender began at the young age of 18. He is a habitual sex offender and has been arrested six times for sexual crimes. On the one hand, he is not physically injured his victims and does not have a history of aggression or physical violence. However, he has molested very young and vulnerable children as young as 2 and 3 years-old. He is driven by his pedophilia and has committed new sexual offenses while under investigation or on probation for prior sex offenses. He also exhibits *rapid reoffending,* defined as committing a new sexual offense within a year from sanction/release for a prior sex offense.

14

On 1-8-93, he was arrested in the military in Hawaii for producing child porn and indecent acts with a child approximately 2 months later (3-16-93) he was arrested for fondling a 2 year-old boy. Twenty months later (6-9-94) his probation was revoked for exposing himself and having sexual contact with minor males. [Respondent] was released from prison on 1-6-06. Only 6 months later (7-22-06) he violated parole for enticing a young boy to watch him masturbate.

[Respondent] has reoffended twice while in outpatient sex offender treatment (1994 and 2006). He has an emotional identification with children and demonstrates intimacy deficits by an absence of romantic relationships with adults. He has produced child pornography by taking sexual photos of young boys. He has molested stranger victims and several of his offenses have occurred in public places (restrooms in libraries and movie theaters), suggesting that the higher risk of getting caught does not deter him from offending. Stranger victims and offending in public places are two empirically supported risk factors that increase sexual recidivism. In one case he used money to entice a victim by dropping a dollar bill on the floor of the bathroom stall to gain the victim's attention. He has used other grooming techniques to seduce victims, including showing them porn. He remains an untreated sex offender without a release plan and has not made any significant gains in the past five years during incarceration to reduce his risk to reoffend.

Based on an overall review of the risk assessment scales and other factors (protective factors, evidence of change/progress, and case-specific issues), it is my opinion that [Respondent] is at high risk for sexual reoffense.

(See id. 15-16.)

## F.    Evaluation of Dr. Tanya Cunic

**1.**    Dr. Tanya Cunic is a forensic psychologist who works for

the BOP at FCI Butner. Her Curriculum Vitae is Government Exhibit

3. Dr. Cunic's initial Forensic Evaluation of Respondent dated April 9, 2007, is Government Exhibit 4. Her updated Forensic Evaluation dated March 8, 2011, is Government Exhibit 5.

2. Dr. Cunic opined that Respondent meets the criteria for civil commitment as a sexually dangerous person under the Adam Walsh Act.

3. In forming her opinion, Dr. Cunic reviewed the written discovery provided to Respondent, some of which is presented to the Court as Government Exhibits 7-18. The written discovery includes information related to Respondent's criminal history, social history, institutional reports, investigative records related to his sexual conduct and psychological evaluations by other mental health care providers. Dr. Cunic also conducted a clinical interview of Respondent on March 30, 2007, but he refused to allow her to interview him in 2011. Dr. Cunic also considered Respondent's range of risk using actuarial tools and dynamic risk and need assessment.

4. Dr. Cunic determined that Respondent had previously committed or attempted to engage in child molestation, specifically "Within the past 18 years, he has been twice convicted for sexual behavior with children. Furthermore, his probation has been revoked twice because of his interactions with minors. He has also been discharged from the Army and terminated from employment." (Government Ex. 5, 3.)

16

**5.** Dr. Cunic diagnosed Respondent with the following mental disorders: pedophilia, sexually attracted to males, exclusive type and personality disorder, not otherwise specified, with antisocial traits. (See id.)

**6.** Dr. Cunic used the STATIC-99R and the RRASOR to assess Respondent's risk to reoffend. Dr. Cunic scored Respondent as an 8 on the STATIC-99R, which placed him in the high risk category. She noted that offenders with the same score from the preselected high risk and needs sample have been found to sexually reoffend after release from incarceration at a rate of 45% in five years and 55.3% in ten years. Dr. Cunic scored Respondent as a 5 on the RRASOR, which placed him in the high risk category. She noted that offenders with the same score on the RRASOR have been found to sexually reoffend after release from incarceration at a rate of 49.8% in five years and 73.1% in ten years. (See id. 3-5.)

**7.** Dr. Cunic also considered other empirically-validated factors which may exacerbate his overall level of risk including: "intimacy deficits (as evidenced by an absence of current on-going, romantic relationships), past history of drop out from sex offender treatment due to continued sexual offending (in Hawaii in 1993/1994), revocations of conditional release (probation revoked in 1994 and 200[6]), and early onset of sexual offending (first sexual offense charge at age 18)." (Id. 5.)

17

**8.** Dr. Cunic's final opinion on the issue of Respondent's sexual dangerousness was that:

> [Respondent] was assigned the following diagnoses: Pedophilia, Sexually Attracted to Males, Exclusive Type and Personality Disorder, NOS with Antisocial Traits. It is believed these conditions qualify as serious mental illnesses, abnormalities, or disorders. Furthermore, it is believed that, because of these conditions, [Respondent's] high actuarial score, and his history of offending, the respondent would have serious difficulty in refraining from sexually violent conduct or child molestation. In conclusion, it is opined to a reasonable degree of professional certainty that [Respondent] should be considered to be a sexually dangerous person.

(Id.)

## G. Evaluation of Respondent by Dr. Joseph Plaud

**1.** Dr. Joseph Plaud is a clinical and forensic psychologist. His Curriculum Vitae is Respondent's Exhibit 1. His forensic evaluation of Respondent dated July 18, 2011, is Respondent's Exhibit 2.

**2.** Dr. Plaud reviewed the same documents made available to Dr. Zinik and Dr. Cunic. He also interviewed Respondent.

**3.** Dr. Plaud concluded that Respondent does not meet the criteria for civil commitment under the Adam Walsh Act as a sexually dangerous person.

**4.** Dr. Plaud determined that Respondent had previously committed or attempted to engage in child molestation.

**5.** Dr. Plaud found that Respondent could be diagnosed with

pedophilia, but that there is significant question as to the validity and/or strength of that clinical diagnosis today. Essentially, Dr. Plaud said that Respondent is sexually attracted to pre-pubescent children, but he had a breakthrough in 2006 so he might not be a pedophile who abuses children any longer.

**6.** Dr. Plaud relied upon one actuarial tool, the Multisample Age-Stratified Table of Sexual Recidivism Rates ("MATS-1") to support his opinion of Respondent's risk of future dangerousness. Out of a possible 8 points that a sex offender could receive on the MATS-1, Dr. Plaud assigned Respondent 6 points. Based on this score and Respondent's age, Dr. Plaud opined that sex offenders who are similarly situated to Respondent sexually reoffend after release from incarceration at a rate of 25.5% in eight years.

**CONCLUSIONS OF LAW**

**A.    Respondent Has Engaged in or Attempted to Engage in Sexually Violent Conduct or Child Molestation.**

**1.** Petitioner has established by clear and convincing evidence that Respondent has engaged in or attempted to engage in sexually violent conduct or child molestation in the past including his conduct related to the criminal convictions or violations of supervision in 1989, twice in 1993, 1994, 2002, and 2006.

**B.    Respondent Is "Sexually Dangerous" to Others.**

**1.** First, Petitioner has established by clear and convincing

evidence that Respondent suffers from a serious mental illness, abnormality or disorder, to wit pedophilia, sexually attracted to males.

**2.**    Second, Petitioner has established by clear and convincing evidence that as a result of this serious mental illness, abnormality, or disorder, Respondent would have "serious difficulty in refraining from sexually violent conduct or child molestation if released."

**3.**    Petitioner must show that Respondent's difficulty in refraining will be "serious," but it need not establish that Respondent will, or is likely to, reoffend. <u>See</u> <u>United States v. Hunt</u>, 643 F. Supp. 2d 161, 179-81 (D. Mass. 2009). Instead, the analysis focuses on Respondent's volitional control understood in relation to his mental illness. <u>See</u> <u>United States v. Carta</u>, Civil No. 07-12064-PBS, 2011 WL 2680734, *22 (D. Mass. July 7, 2011). This determination requires more than relying on recidivism rates of past offenders, but requires analysis of a range of different factors, including Respondent's history before incarceration, his time in prison, and the opinions of experts. <u>Id.</u>

**4.**    A court must consider the constitutional constraints on the civil commitment scheme when making a decision on this prong of the analysis. <u>Carta</u>, 2011 WL 2680734 at *23 ("In <u>Kansas v. Crane</u>, 534 U.S. 411 (2002), the Supreme Court held that in order to civilly

commit someone for sexual dangerousness 'there must be proof of serious difficult in controlling behavior.' Id. at 413. The Court noted that this standard allowed courts wide discretion in relying on a number of different factors relevant to sexual dangerousness. The standard did not have 'any kind of narrow or technical meaning;' nor was it demonstrable with 'mathematical precision.'").

5.    In other words, in its analysis of potential future risk, the Court has considered more than just whether Respondent exhibits traits shared by other recidivists. See id. Rather, the Court has considered Respondent's volitional control "in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself. . . [in such a way that] distinguish[es] [him] from the dangerous but typical recidivist convicted in an ordinary criminal case." Id.

6.    Respondent appears to have little to no ability to manage his mental illness.

7.    The evidence in this case, including the testimony of Respondent at trial, supports the Court's conclusion that Respondent would have "serious difficulty in refraining from sexually violent conduct or child molestation if released."

8.    The testimony of Respondent's mother is not persuasive and does not alter the Court's opinion that Respondent would be sexually dangerous if released.

**9.** The Court rejects Dr. Plaud's opinion that Respondent cannot be diagnosed with pedophilia because Respondent allegedly made a cognitive connection in July 2006 to stop engaging in risky sexual behavior. Essentially, Dr. Plaud has opined that Respondent stopped being a pedophile in July 2006 by making a decision. However, the Court cannot reconcile Dr. Plaud's opinion with all the other evidence in this case, including Respondent's admission that he remains sexually attracted to nine to twelve year old boys.

**10.** The Court gives greater weight to the overarching opinions of Dr. Zinik and Dr. Cunic than to the narrow, statistic-centric opinion of Dr. Plaud as it relates to the question of whether Respondent would have serious difficulty in refraining from future acts of child molestation. Dr. Zinik and Dr. Cunic's analysis of Respondent's sexual dangerousness is more thorough, better reasoned, better supported by the record, and better supported by independent research. Even if the Court agreed with Dr. Plaud's opinion based on the MATS-1, it concludes that Respondent is sexually dangerous. Therefore, the Court agrees with Dr. Zinik and Dr. Cunic's more convincing and consistent opinions.

**11.** The Court concludes that Respondent has engaged in sexually violent conduct or child molestation in the past, currently suffers from a serious mental illness, abnormality, or disorder, and will have serious difficulty in refraining from sexually violent

conduct or child molestation if released.

**12.** Respondent is committed to the custody of the Attorney General under the Adam Walsh Act until such time as he is no longer a sexually dangerous person.

Respectfully submitted, this 17th day of January, 2012.

THOMAS G. WALKER
United States Attorney

BY: /s/ W. ELLIS BOYLE
W. ELLIS BOYLE
Attorney for Petitioner
Assistant United States Attorney
Civil Division
3l0 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 2760l
Telephone: (9l9) 856-4530
Facsimile: (919)856-4821
Email: ellis.boyle@usdoj.gov
N.C. Bar #: 33826

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a copy of the foregoing has been served upon Sonya Allen, counsel for Respondent, by electronically filing the foregoing with the Clerk of Court this 17th day of January, 2012, using the CM/ECF system which will send notification of such filing to the above.

BY: /s/ W. ELLIS BOYLE
W. ELLIS BOYLE
Attorney for Petitioner
Assistant United States Attorney
Civil Division
3l0 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 2760l
Telephone: (9l9) 856-4530
Facsimile: (919)856-4821

23