UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:07-HC-2078-D

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ATIBA WADE | RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Comes now the Respondent, Atiba Wade, by and through undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

Petitioner, the United States of America ("the government") instituted this civil action on April 20, 2007, seeking to commit Atiba Wade ("Mr. Wade" or "Respondent") as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act"). 18 U.S.C. § 4248. [Docket Entry ("DE") 1.] The Government filed a certificate stating that mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Act. A certificate filed under the Act stays Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as sexually dangerous

1

person. The government's petition was filed two (2) days prior to respondent's scheduled date of release from the BOP custody on April 22, 2007.

An evidentiary hearing and bench trial was held before this Court on January 19, 2012. After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes the government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act. The Court also concludes that the government has failed to establish by clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality, or disorder.

## II. FACTS

1. Atiba Wade was born in 1971 and was forty (40) years of age at the time of his evidentiary hearing.

2. At the time of his hearing, Mr. Wade had been incarcerated for almost five (5) years after his release date.

3. Mr. Wade's release date from the BOP was April 22, 2007.

### A. Personal History

4. Mr. Wade was raised by his mother and his grandmother. His father was absent during his childhood. He has half siblings on his father's side. Mr. Wade has a close and supportive relationship with his mother. She currently resides in Nevada.

5. Mr. Wade graduated from high school in Cleveland, Ohio and entered the United States Army immediately following his graduation.

6. Mr. Wade has never been married and has no children.

7. Mr. Wade has never been diagnosed with alcohol or drug abuse.

8. Mr. Wade has held several jobs subsequent to his military enlistment from 1990 through 1993. Those jobs included Mr. Wade working as a courier and for a noodle company.

**B.     Criminal and Sexual Offense History**

9. In 1993, Mr. Wade was charged with Indecent Acts or Liberties with a Child under the UCMJ. Those charges were transferred to civilian authorities and he was convicted of sexual assault in the state of Hawaii on February 1, 1994. He was sentenced to 90 days incarceration and five years probation.

10. In November 1994, Mr. Wade's probation was revoked for failure to refrain from frequenting areas where minors congregate. He was sentenced to five (5) years in prison for this probation violation.

11. In February 2002, Mr. Wade pled guilty to Conspiracy to Commit Wire and Mail Fraud in federal court in the state of Ohio and was sentenced to thirty (30) months incarceration.

12. In May 2002, Mr. Wade pled guilty to Disseminating Matter Harmful to Juveniles, Pandering Obscenity, and Possession of Criminal Tools. He was sentenced to eighteen (18) months incarceration.

13. In January 2006, Mr. Wade was released from prison and began three (3) years supervised release in Nevada.

14. In August 2006, Mr. Wade violated conditions of his supervised release and Mr. Wade was returned to custody for eight (8) months for the violation of "Association With Persons Under 18".

**C.     Bureau of Prisons Disciplinary History**

15. Mr. Wade has no BOP disciplinary infractions.

### D. Sex Offender Treatment

16. Mr. Wade has received sex offender treatment while incarcerated. He successfully completed sex offender treatment at Kuilani Correctional institution in the state of Hawaii. Mr. Wade also received eight (8) months treatment while residing in Las Vegas, Nevada on probation in 2006.

### E. Current Status

17. On February 27, 2009, the United States filed the instant action seeking to commit Mr. Wade as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248. Pursuant to the statute, the filing of this action stayed his release pending the outcome of the proceedings. Mr. Wade completed his criminal sentence on April 22, 2007 and was scheduled to be released that day if the government had not filed the certification pursuant to § 4248. Respondent's § 4248 proceeding was stayed *ab initio* while the appellate courts analyzed § 4248's constitutionality. Respondent's case was assigned to this Court on August 6, 2010.

## III. EXPERT'S QUALIFICATIONS

18. The Petitioner called Dr. Gary Zinik to testify as an expert in this case. Dr. Zinik reviewed Mr. Wade's records but did not conduct a current interview of Mr. Wade.

19. The Petitioner also called Dr. Tanya Cunic as an expert in this case. Dr. Cunic reviewed Mr. Wade's records but did not conduct a current interview of Respondent.

20. Respondent called Dr. Joseph Plaud as an expert in this case. Dr. Plaud reviewed Mr. Wade's records and conducted a current interview of Mr. Wade.

21. The parties did not challenge the qualifications of any of the above experts. The Court, having reviewed the curriculum vitae of the experts, finds that each individual is qualified by education and experience to offer expert testimony in this matter.

## IV.　LEGAL PRINCIPLES

### A.　**Section 4248 Violates Equal Protection**[1]

22. As a preliminary matter, this Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public. *Incorporated by reference, United States v. Timms*, 5:08-HC-01256-BO (Eastern District of North Carolina, filed July 1, 2011).

### B.　**Delay in the Proceedings Violated Respondent's Due Process Rights**

23. This Court also finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248. *Id.*

### C.　**18 U.S.C. § 4248 as applied to Respondent Constitutes Criminal Punishment**

24. This Court finds that the conditions of Respondent's confinement constitute criminal punishment that violates the Double Jeopardy Clause, the Ex Post Facto Clause, the Eighth

---

[1] Mr. Wade is aware that both the Fourth Circuit and this Court has ruled in the government's favor with respect to the first three legal principles. *United States v. Timms*, Nos. 11-6886 and 11-6941, ___ F. 3d____ (4th Cir. Jan. 9, 2012). However, because the Supreme Court has not ruled on these matters, Mr. Wade includes them in his proposed findings of fact and conclusions of law for preservation.

Amendment prohibition against cruel and unusual punishment, and the jury trial right contained in the Sixth Amendment.

D. **Standard of Proof and Elements Required to be Established**

25. The government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). "While 'clear and convincing evidence' is not statutorily defined, there is no dispute that this standard requires a greater degree of proof than a preponderance of the evidence, yet less than beyond a reasonable doubt." *United States v. Revland*, 5:06-HC-02212-BR (Eastern District of North Carolina, filed December 23, 2011). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "'Clear and convincing' has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, . . .and, as well, as evidence that proves the facts at issue to be 'highly probable'." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (internal quotations and citations omitted). It has alternatively been described "as meaning 'highly probable.'" *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)). As noted by this Court,

> "standard jury instructions commonly define the clear and convincing evidence standard in the same way. *See, e.g.*, 3 Fed. Jury Prac. & Instr. § 104:02 (6th ed. 2011)("'Clear and convincing evidence' is evidence that produces in your mind a firm belief or conviction as to the matter at issue. Clear and convincing evidence

6

involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case."

*United States v. Revland*, 5:06-HC-02212-BR (Eastern District of North Carolina, filed December 23, 2011)

26. To commit Respondent, the government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

27. This phrase has not been defined by the statute. The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 413.

28. A finding of dangerousness is also constitutionally required. *Kansas v. Crane*, 534 U.S. 407-09, 410 (stating "we have consistently upheld involuntary commitment statutes . . .

7

Case 5:07-hc-02078-D-JG   Document 85   Filed 01/17/12   Page 7 of 17

[when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-58; quotations omitted)). *See also Foucha v. Louisana*, 504 U.S. 71, 82-83 (1992).

29. The Court finds that in this regard, the statute and due process considerations require that, in addition to a volitional impairment, the government must prove by clear and convincing evidence that Respondent poses a risk of reoffense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

30. In this case the government has proven neither. The evidence in this case does not demonstrate that Respondent currently suffers from a volitional impairment. The evidence also demonstrates that the recidivism rates proposed by the government's experts are likely overestimates. Further, even if this Court were to credit the government's experts regarding Respondent's likelihood of recidivism, the evidence presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

## V. FINDINGS

### A. **Prior Bad Acts**

31. Mr. Wade does not contest that he has engaged in child molestation in the past. This Court finds that the government has established this element by clear and convincing evidence.

8

### B. Suffers from a Serious Mental Illness, Abnormality or Disorder

32. Extensive testimony and evidence was submitted with respect to the issue of whether Mr. Wade suffers from a serious mental illness, abnormality or disorder. Both Dr. Zinik and Dr. Cunic diagnosed Mr. Wade with a serious mental disorder, Pedophilia, Sexually attracted to males, apparently non-exclusive. Dr. Cunic also diagnosed Mr. Wade with Personality Disorder, Not Otherwise Specified with Antisocial Traits. Dr. Joseph Plaud, the Respondent's expert, testified although Mr. Wade could be diagnosed with a non-exclusive pedophilia diagnosis, there is significant question as to the validity and/or strength of this clinical diagnosis today.

33. Because of the disagreement between the experts, the Court finds that the Petitioner has failed to demonstrate by clear and convincing evidence that Mr. Wade suffers from a serious mental illness, abnormality or disorder. Accordingly, because the Petitioner has failed to show that Mr. Wade suffers from a serious mental illness, abnormality or disorder, the Petitioner has also failed to show that because of such disorder, Mr. Wade would have serious difficulty refraining from sexually violent conduct or child molestation.

### C. Serious Difficulty Refraining from Child Molestation

34. In order to commit Mr. Wade, the government must prove that the disorder results in "serious difficulty refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). As discussed previously, this term implies a volitional impairment.

35. The DSM-IV-TR is clear that the fact that someone has been diagnosed with a mental illness or disorder does not answer the question of whether that person's volition is impaired. The manual states:

> It is precisely because impairments, abilities and disabilities vary widely within
> each diagnostic category that assignment of a particular diagnosis does not imply a

> specific level of impairment or disability. The fact that an individual's presentation meets the criteria for DSM diagnoses does not carry any necessary implications regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is or was unable to control his or her behavior at a particular time.

DSM-IV-TR at xxxiii.

36. This Court finds that the government has not shown by clear and convincing evidence that Respondent currently presents a serious mental illness, abnormality or disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

## VI. DANGEROUSNESS AND RISK ASSESSMENT

### A. Introduction

37. All of the experts in this case conducted a risk analysis based on empirical tools and actuarial instruments to evaluate, quantify, and support their dangerousness determination.

38. No psychological tests or actuarial instruments have been developed that predict with certainty an individual's risk of future sexual offending. The risk instruments are based on group data and provide risk estimates of defined sample groups to which an individual is compared. "The recidivism rates contained in the actuarial tables are the product of the amalgamated risk characteristics of the group and, therefore cannot be ascribed to a particular individual since the risk factors for the individual may vary substantially from that of the group." Theodore Donaldson and Brian Abbott, *Prediction in the Individual Case: An Explanation and Application of its Use with the Static-99R in Sexually Violent Predator Risk Assessments*, 29(1) American Journal of Forensic Psychology 7 (2011). The actuarial instruments provide only group

10

prediction rates on risk of re-offending. The instruments do not provide individual rates of reoffending. *Id.*

39. In evaluating Mr. Wade, all of the experts utilized a clinical analysis combined with actuarial instruments and psychological tests to determine if Mr. Wade presents a serious risk of reoffending.

40. Three expert opinions were offered by the parties on the issue of whether Mr. Wade meets the criteria for commitment pursuant to 18 U.S.C. § 4248. Dr. Zinik and Dr. Cunic, the government's experts, both opined that Mr. Wade is a sexually dangerous person as defined by the Act. Dr. Plaud, the Court-appointed expert, opined that Mr. Wade is not a sexually dangerous person and is not at high risk of reoffending if released.

41. For the reasons set forth below, the Court finds that the government has not established by clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control and would result in him having serious difficulty refraining from sexually violent conduct or child molestation.

B. **Expert Opinions**

   1. **Dr. Gary Zinik**

42. Dr. Zinik authored an evaluation report dated March 25, 2011. He opined, based on his review of Mr. Wade's records and without interviewing Mr. Wade, that he meets the criteria as a sexually dangerous person as described in 18 U.S.C. § 4247. In reaching his conclusion, Dr. Zinik used the Static 99 Revised, the Static-2002 Revised,[2] and the Minnesota Sex Offender

---

In 1999, Dr. Karl Hanson, a statistical researcher with the Canadian Office of Public Safety, developed the Static-99, an actuarial instrument consisting of ten factors. The ten factors are: whether the offender is younger than 25 years old, whether the offender ever lived with a lover

Screening Tool-Revised (MnSOST-R) [3] actuarial instruments. He testified that Mr. Wade is at a high risk of sexual reoffense.

---

for at least two years, index non-sexual violence, prior non-sexual violence, number of prior sentencing dates, any unrelated victims, any stranger victims, and any male victims. The Static-99 scores the offender on a scale from 0 to 12. Each score is associated with a risk level (i.e. high, medium, low). Each score was also associated with a percentage of recidivism over 5 years, 10 years, and 15 years. Dr. Hanson derived the original recidivism percentages associated with each score on the Static-99 by retrospectively scoring the instrument on a group of 1,086 offenders released from incarceration in Canada and the United Kingdom between 1958 and 1993 with known 5, 10, and 15 year recidivism rates after release. The average age of these 1,086 individuals was 33.5 years old. The Static-99 has been revised and replaced by the 99-R and revised again in 2002.

In the fall of 2008, the developers of the Static-99 issued new recidivism percentages associated with the different scores on the instrument. The prior recidivism percentages associated with the original Static-99 were derived from sex offenders released from 1958 to 1993, these newer recidivism percentages are based on contemporary samples of sex offenders who were released from incarceration in the 90s and after. The new recidivism percentages associate with the different scores on the Static-99 are substantially lower than the old recidivism percentages. (*Id.*) *See also* A. Harris et al., *Are New Norms Needed for the Static-99* (presented at the 27th Annual Research and Treatment Conference of the Association for the Treatment of Sexual Abusers, Atlanta, Georgia, Oct. 23, 2008).

[3] The MnSOST-R was developed by Epperson, Kaul and Huot in association with the Minnesota Department of Corrects in 1995 and subsequently revised. The development sample for the MnSOST-R was comprised of 256 sex offenders incarcerated in the state of Minnesota for felony sex offenses. The MnSOST-R is a sixteen question instrument comprised of twelve static factors and four dynamic factors. The score ranges from 16 to 31. Each score is associate with likelihood of re-arrest over a period of six years. Douglas Epperson et al., *Minnesota Sex Offender Screening Tool–Revised (MnSOST-R): Development, Validation, and Recommended Risk Level Cut Scores* (December 2003.) In January 2012, Minnesota will cease utilizing the MnSOST-R in favor of an improved actuarial tool. Grant Duwe, Director of Research and Evaluation, Minnesota Dep't of Corrections, The Minnesota Sex Offender Screening Tool-3, Presentation at the Conference for the Association for the Treatment of Sexual Abusers (Nov. 4, 2011).

**2.     Dr. Tanya Cunic**

43.    Dr. Ross, a psychologist employed by the BOP, opined that Mr. Wade meets the criteria as a sexually dangerous person as described in 18 U.S.C. § 4248.  She diagnosed Mr. Wade with Pedophilia., Sexually Attracted to Males, Exclusive Type and Personality Disorder, Not Otherwise Specified with Antisocial Traits.  She testified that because of Mr. Wade's actuarial scores and his history of reoffending, he should be considered sexually dangerous.

**3.     Dr. Joseph Plaud**

44.    Dr. Plaud opined that Mr. Wade is not a sexually dangerous person as described in 18 U.S.C. § 4248.  Dr. Plaud testified that Mr. Wade could be diagnosed with Pedophilia, however, there is significant doubt as to whether he would have serious difficulty in refraining from sexually violent conduct if he were released from a secured facility.   Dr. Plaud used the MATS-1 to assess Mr. Wade's risk of sexual reoffending and based upon the data, the sexual reoffense range over an eight (8) year period for the sexual offenders in Mr. Wade's current age and score range was in an area in which group statistics indicate approximately three quarters of the sexual offenders do not reoffend with another sexual offense.

**C.  Atiba Wade**

45**.**    Mr. Wade testified at trial with regard to the treatment he received in the past and his prior convictions for sexual conduct.

**D.  Joann Wade**

46.    Ms. Wade testified at trial with regard to her son's prior treatment and her
         commitment to providing him with financial and emotional support upon his future
         release.

13

## VII. CONCLUSIONS OF LAW

47. The Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments to the United States Constitution because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public.

48. The Court finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the Court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248.

49. The Court finds that the conditions of Respondent's confinement constitute criminal punishment that violates the Double Jeopardy Clause, the Ex Post Facto Clause, the Eighth Amendment prohibition against cruel and unusual punishment, and the jury trial right contained in the Sixth Amendment.

50. The Court finds that Respondent has engaged or attempted to engage in acts of sexual violence or child molestation in the past.

51. The Court finds that the government has not proven by clear and convincing evidence that the Respondent suffers from a serious mental illness, abnormality, or disorder.

52. The Court finds that the government has not proven by clear and convincing evidence that Respondent would have "serious difficulty refraining from sexually violent conduct of child molestation if released."

53. The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be

difficult, if not impossible, for the person to control his dangerous behavior. *See Kansas v. Crane*, 534 U.S. 407, 411 (2002) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)).

54. The Court has been presented with three opinions about Respondent's risk of reoffense in the event he is released. The Court has considered the information and finds this information relevant to its determination of Respondent's sexual dangerousness. Having considered the reports, forensic evaluations, and testimony of the three experts in this case, the Court finds that the government has not proven dangerousness by clear and convincing evidence sufficient to justify commitment.

55. The Court accords the opinions of Dr. Zinik and Dr. Cunic less weight than that of Dr. Plaud.

56. The Court finds the opinion of Dr. Plaud to be the most well-reasoned and persuasive. Dr. Plaud conducted a current interview of Mr. Wade. He also used the most recently developed actuarial instrument, the MATS-1, which uses the same information as the Static-99R but quantifies the data in a more systematic manner to account for an individual's age. The question before this Court is whether Mr. Wade is currently a serious risk of reoffending. The Court finds Dr. Plaud's opinion on this issue to be the most informative, supported by actuarial instruments and psychological tests and most persuasive on the issue before the Court.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Atiba Wade is not a "sexually dangerous person" and order his release from the custody of the Federal Bureau of Prisons.

Respectfully submitted this 17th day of January, 2012.

        THOMAS P. MCNAMARA
        Federal Public Defender

        /s/ *Sonya M. Allen*
        SONYA M. ALLEN
        Assistant Federal Public Defender
        E-mail: Sonya_Allen@fd.org
        NC State Bar No. 27194

        /s/ *Raymond Tarlton*
        Raymond Tartlon
        Assistant Federal Public Defender
        E-mail: Raymond_Tarlton@fd.org
        NC State Bar No. 38784

        ATTORNEYS FOR RESPONDENT
        Office of the Federal Public Defender
        150 Fayetteville Street, Suite 450
        Raleigh, North Carolina 27601
        Telephone: 919-856-4236; Fax: 919-856-4477
        LR 57.1 Counsel, Appointed

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

| | |
|---|---|
| **W. Ellis Boyle** <br> **G. Norman Acker, III** <br> **R.A. Renfer, Jr.** <br> U. S. Attorney's Office <br> Rm. 800, 310 New Bern Ave. <br> Raleigh, NC 27601 <br> Email: ellis.boyle@usdoj.gov <br> Email: norman.acker@usdoj.gov <br> Email: rudy.renfer@usdoj.gov | **Michael Bredenberg** <br> Bureau of Prisons, Legal Dept. <br> P.O. Box 1600, Old Highway 75 <br> Butner, NC 27509 <br> Email: mbredenberg@bop.gov |

by electronically filing the foregoing with the Clerk of Court on January 17, 2012 using the CM/ECF system which will send notification of such filing to the above:

This the 17th of January, 2012.

/s/ *Sonya M. Allen*
SONYA M. ALLEN
Assistant Federal Public Defender
Office of the Federal Public Defender
Attorney for the Respondent
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Sonya_Allen@fd.org
NC State Bar No. 27194
LR 57.1 Counsel
Appointed